Opinion
GATES, J.
Defendant appeals from the judgment entered following a jury trial that resulted in his conviction upon two counts of felonious assault (Pen. Code, § 245) during one of which he had intentionally inflicted great bodily injury within the meaning of Penal Code section 12022.7. He was also found to have served two prior and separate terms of imprisonment. (Pen. Code, § 667.5, sub. (b).) He contends: “I. Because the trial court’s admonition regarding the dangers of self-representation were inadequate, appellant did not knowingly and intelligently waive his right to counsel. II. Appellant’s request for counsel on the day trial was to begin was not untimely. [III.] It was prejudicial error to shackle and gag appellant during a portion of the trial and then fail to instruct that the restraints had no bearing on appellant’s guilt. [IV.] Appellant’s motion for a new trial was improperly denied since the trial court had a sua sponte duty to bifurcate the trial on the issue of guilt and the validity of the prior convictions.”
Viewed in the light most favorable to the judgment, as required by the usual rule governing appellate review, the evidence herein established that on August 28, 1981, Paul Sanchez was managing a hotel in Huntington Beach. At approximately 3:30 p.m. that day he had gone to the bathroom located on the second floor in response to a tenant’s complaint that “some guys had run up there to go shoot up.” There was no one there when he arrived but as he turned to leave appellant came up behind him, turned him about and smashed him in the face with a beer bottle. The force of the blow drove Sanchez to his knees, splitting and breaking his nose as well as opening a cut below his eye.
Since appellant and Sanchez were well acquainted, a fact even appellant conceded, the possibility of mistaken identity was not truly an issue. Sanchez testified that he believed appellant had hit him with the bottle because “I had warned him over and over not to be going inside the hotel,” and using its facilities for improper purposes. The police were called and given appellant’s description.
A few hours later when Sanchez and his daughter exited through the rear door of the hotel to purchase food, they were met in the alley by appellant and two other men. After one of them said, “We got you this time,” Sanchez was struck in the head with an iron bar wielded by one of his assailants. *1080 He fell to the ground where the three men joined in kicking him, injuring his ribs. Not content with this, appellant while standing over Sanchez, so savagely slashed his face with a razor that he inflicted a permanent scar “running from the center portion of his eyebrow, starting an inch above the eyebrow, to his ear on the right side of his head.”
When others, including Sanchez’ wife and another tenant, came to Sanchez’ rescue, appellant and his cohorts fled separately. Appellant initially entered a car driven by the woman with whom he was living, Glenda Lopez. However, he leaped therefrom when she struck a large trash can, propelling it against Sanchez’ daughter, injuring her. The police were called once more and as one of the units responded its driver, Officer John Clewett, observed appellant, whose description had again been broadcast, hastening from the scene. Following a short pursuit in his police car, Officer Clewett briefly lost sight of the fleeing appellant. He began a foot search and soon saw “somebody’s head protruding” from a large Dempsey dumpster. He described appellant’s capture in the following exchange:
“Q. [Deputy District Attorney] What did you do then? A. I approached to where I could get a view into the dumpster, hoping that he couldn’t see me first, or whatever was in there. At that time, I drew my revolver, approached the dumpster, looked over and observed the defendant sitting inside the dumpster. Q. Did you recognize him as the same man you had been chasing? A. Yes. He was the same man. And I observed at that time that he was sitting, holding his baseball cap in his hands. Q. His baseball cap he was holding in his hands? A. Yes. Q. Was it blue? A. Yes, it was a blue L.A. Dodger type. Q. Did he still have that white tank top on? A. Yes, he did. Q. Did you notice anything else about his appearance as you were getting him out of the trash can? A. I observed that he had blood on his right hand. Fresh blood. Q. Not coagulated yet? A. No. It was still bright red. Q. Did you see any cuts or injuries to his body? A. No. After removing him from the trash can, I inspected his hands and there was no cuts or bruises on him or his hands that I could see.”
In defense appellant averred that although he had had a disagreement with Sanchez in the past, he had not assaulted Sanchez on either occasion on August 28, 1981. He asserted that he had first seen Sanchez that day when the latter had entered a bar where appellant was drinking with Miss Lopez. Appellant claimed that at that time Sanchez had already been engaged in a fight with two other men and was bleeding from a facial wound. Not wishing to become involved, appellant decided to leave when he heard sirens approaching and ultimately was discovered hiding in the trash can as described by Officer Clewett. He acknowledged that there was blood on his hand at that time but asserted that it had come from a small cut inflicted by Sanchez *1081 when, for some unexplained reason, appellant had attempted to trip Sanchez as Sanchez was backing out of the bar.
Manifestly, once all questions of credibility had been resolved, the foregoing evidence, albeit conflicting, was abundantly sufficient to sustain appellant’s conviction. Quite appropriately he does not contend otherwise. His first two contentions arise from the procedural incidents we now describe. On October 15, 1981, when appellant appeared for his continued preliminary hearing the following exchange occurred:
“The Court: Mr. Trujillo, it is my understanding that you wish to represent yourself in this felony charging you with violation of Section 245a of the Penal Code in two counts. You understand you have a right to have an attorney with you. You have a right to have an attorney appointed if you are not able to hire one yourself. You have been represented by the Public Defender and it is my understanding from them that you wish to make a motion to have the Public Defender relieved as attorney of record and that you wish to appear in pro per as your own attorney; is that correct, sir?
“The Defendant: Yes, it is.
“The Court: You understand on the other side there will be a trained District Attorney who has been through college and law school and knows the rules of law and the rules of evidence, knows how to make motions and arguments and objections and presumably unless you have been through law school you do not know all of that and are not similarly qualified and you might be at a disadvantage; do you understand that?
“The Defendant: Yes, sir, I do.
“The Court: And you feel you are capable of handling this without the assistance of an attorney?
“The Defendant: Yes, I do.
“The Court: You understand you would not be able to appeal based upon the fact that you had inadequate Counsel since you have chosen and are choosing to represent yourself, be your own attorney; do you understand that?
“The Defendant: Yes, I do.
“The Court: And you would not be able to complain that you were not properly represented and did not have proper advice in this preliminary hearing; do you understand that?
*1082 “The Defendant: Yes, sir, I do.
“The Court: And you give up those rights to appeal on that basis and your right to be represented by an attorney at this preliminary hearing; is that correct?
“The Defendant: Yes. Well, I waive the attorney.
“The Court: Are you ready for preliminary hearing at this time?
“The Defendant: No, I’m not.
“The Court: Tell me when do you plan to be ready?
“The Defendant: A month would be adequate time to get some motions from the law library.
“The Court: Well, you’ll have time to make any motions.
“The Defendant: I would like to have adequate time to prepare Defense.
“The Court: Well, this is not the time to present your Defense, in any event; but rather a time to find out whether the People by their evidence alone is sufficient evidence to bind you over for trial in Superior Court and to show that an offense has been committed and that offense was a felony and that there is reasonable cause to believe you committed that offense. Now, the Defense should generally be reserved for the trial, so it appears there is no reason for delay for you to prepare your Defense. I assume that you did not make this decision hastily; is that correct, you thought about this decision to be your own attorney?
“The Defendant: Yes, I thought about it.
“The Court: And you have thought about it more than just today?
“The Defendant: Yes.
“The Court: And more than just yesterday or the day before that even?
“The Defendant: Correct.
“The Court: You made that decision back on September 15th or thereabouts; is that correct?
*1083 “The Defendant: No, I don’t know the date I made the decision.
“The Qourt: Sometime between now and September 15th and not this week, right?
“The Defendant: Right.
“The Court: Are the People ready?
“Ms. Liebherr: The People’s witnesses are ready on call.”
No proceedings were actually conducted on that date, however, Approximately three weeks later on November 4, 1981, appellant appeared before a commissioner and stipulated that this officer might conduct his preliminary examination. After he was asked if he was “ready to proceed at this time,” the following is reported:
“The Defendant: No, Your Honor, I’ve only been the pro per status since Friday night. I was pro per and I haven’t had sufficient time to prepare a Defense.
“The Court: You’re making a motion to continue?
“The Defendant: Correct.
“The Court: The motion is denied. We are going to have the preliminary hearing today.
“The Defendant: Another thing is that I ask the Court to allow for me to get an attorney. I had an attorney appointed to represent me in a Morrisey hearing, an attorney appointed by the State.
“The Court: You had an attorney in this case two months ago and you asked that the attorney be relieved, relieved so you could represent yourself; is that correct?
“The Defendant: Right.
“The Court: You’ve had almost a month since that was done and the People are entitled to a speedy hearing in this case just as well as you are. If you want a Public Defender and if the Public Defender can prepare today then I will allow that, otherwise, we are going ahead with this case today one way or the other, with this preliminary hearing. What happens at the *1084 time of trial is another matter. You’ve got plenty of time, assuming you’re held to answer, you have plenty of time before the matter goes to trial.
“The Defendant: Okay.
“The Court: Do you want to go ahead with yourself or do you want a Public Defender?
“The Defendant: No, I’ll go ahead myself.
“The Court: You’re not asking we appoint a Public Defender for you today?
“The Defendant: No, I’m not.”
Following his preliminary hearing, appellant was bound over to the superior court where, on November 18, 1981, the following exchange preceded his arraignment:
“The Court: People versus Trujillo, [¶] You are representing yourself, are you?
“The Defendant: Yes.
“The Court: I think maybe it would be a good idea for you to talk to the public defender. It’s up to you. You have a right to represent yourself, but I’ll tell you, in all great likelihood it’s going to work very much against you. Although you may be a very bright individual, there is no way you can know the law that people spend their lives studying, but it’s up to you. What do you want to do?
“The Defendant: Well, I will represent myself.
“The Court: All right. Well, you have earlier waived your right to a lawyer, and it’s still your desire, you want to continue to represent yourself; is that correct?
“The Defendant: (Nods affirmatively.)
“The Court: I want you to answer out loud to whatever question I may have, because although I can see your head moving up and down, she has to take down everything, [¶] You have received a copy of the preliminary hearing transcript and also a copy of the Information; is that right, Mr. Trujillo?
*1085 “The Defendant: Correct.
“The Court: All right. Arraign the defendant. . . . [¶] Mr. Trujillo, your right to represent yourself is conditional. That is to say, if at any time I feel that you have abused that privilege or I feel that you are no longer acting in substantially the way as you are acting today, that is to say, if I feel you are not able to represent yourself at some minimal level, then your right to represent yourself will cease, [¶] Do you understand that?
“The Defendant: Yes, sir.
“The Court: All right, [f] For openers, what I am going to order you to do is fill out a pro per petition. That will at least indicate to you the problems that you are going to have. Then later on in the afternoon I will bring you out to see to it that you have gone through that. Thereafter you will have pro per privileges in jail or wherever you may be.
“The Defendant: Your Honor, I am working in the pro per tank in county jail.
“The Court: But that’s revokable, you know that. [¶] What I want you to do is go through and initial it if you understand it. If you don’t, say so. That way at least I have some document to give me an idea. Fill it out, and then you come back and we will set a pre-trial date. ...”
After appellant had completed the written petition as required, the matter concluded:
“[The Court] All right, [¶] Do you have any questions about anything on this two-page document, which really has four sides?[1]
“The Defendant: No.
“The Court: You understand that you are representing yourself, and if it turns out that was a mistake, you will not later be able to claim that you were represented by incompetent counsel. [¶] Do you understand that?
“The Defendant: Yes.
“The Court: All right, [¶] Mr. Trujillo, I think what you are doing is probably very, very foolish, but you have a right to do it, and until you abuse those privileges, you are representing yourself.”
*1086 In the course of appearances on December 17, 22, 30, and 31, 1981, January 4, 5, 8, 19, 25, and 26, February 1, 2, 3, 5, 8, 10, 16, 22, and 26, March 16 and 26, April 9, May 3 and 17, 1982, appellant vigorously represented himself, inter alia, moving for, and obtaining legal supplies, the services of an investigator and extensive discovery, including laboratory testing of his clothing. In addition, appellant filed, and quite brilliantly, albeit unsuccessfully, processed, a motion to dismiss under Penal Code section 995 and, thereafter, petitioned both this court and our Supreme Court under Penal Code section 999a (2 Civ. 64879).
Appellant’s initial contention alleging inadequacy in the trial court’s admonitions to him regarding the risks inherent in his exercise of his constitutional right to self-representation marks either a new zenith or a new nadir, depending upon one’s perspective, in the art of judicial manipulation. As appellant baldly acknowledged below, he was at all times fully aware of his right to an attorney and the sole reason he had determined not to exercise that right was his desire to urge at all levels his claim that he had been deprived of that very right in the course of his preliminary proceedings!
In this fashion appellant, deliberately proceeding on his own behalf, successfully delayed the commencement of this action for more than half a year in order that he might urge he should not have been allowed to act on his own behalf earlier. It was almost to be anticipated then that on June 1, 1982, the date at long last scheduled for trial, he would file an affidavit of prejudice against the judge who had for so long shown him so much consideration.[2] In the courtroom to which the cause was then assigned the following exchange occurred: *1087 pursued any further. I was seeking a remedy through the court of appeals. And if I had a public defender, I know I— [¶] I know enough to understand what I read. And, you know, I’m not—I’m not— [¶] I may not know how to spell, but I am not exactly ignorant. I know that if the judge would appoint me a public defender when he wanted to, he would have denied my 995 and I would have never gotten any farther on any of my appeal motions.”[3] (Italics added.)
*1086 “The Defendant: Can I be appointed a counsel?
“The Court: No. I see no reason in the world why you should be appointed counsel at this point. You fooled around. You sat on this case.
“The Defendant: No. You know, you know I was trying—
“The Court: You sat on this case for all of this time. And this is the first time that you’ve made any motion whatsoever to be relieved of your pro per status.
“The Defendant: If I would have asked for counsel at the time of filing my 995, the judge would have denied my 995 and it would not have been
*1087 This dialogue makes manifest the lack of merit in appellant’s second contention. That is to say, in view of his deliberate attempt to manipulate the court system, the court did not abuse its discretion in refusing to appoint a new attorney on the morning of the day set for the commencement of this long postponed proceeding in the slender hope that after a further continuance to allow such counsel to prepare, he or she might possibly be able to satisfy appellant’s desire to fully control the presentation of his cause.[4] (See People v. Windham (1977) 19 Cal.3d 121, 124 [137 Cal.Rptr. 8, 560 P.2d 1187]; People v. Smith (1980) 112 Cal.App.3d 37, 51 [169 Cal.Rptr. 108]; People v. Smith (1980) 109 Cal.App.3d 476, 485 [167 Cal.Rptr. 303].)
During the selection of a jury, it became apparent that appellant had no intention of conducting himself in a noncontemptuous fashion. He explicitly accused the court of bias and a lack of impartiality, even referring to it as a “Gestapo court.” After 12 potential jurors had been questioned by the court and tentatively seated, appellant refused to indicate whether or not he wished to exercise any challenges to them stating, “I think the best thing for the court to do is to have me removed from the court and proceed without me, you know. And just go ahead and have the court proceedings without me.” Later he flatly announced, “I am not participating in this court. You can do the whole trial without me.” He also added, “No, I am not going to proceed. I am going to go to the bull pen. And if you want to hold the trial without me, without counsel, without anybody, go ahead.”
The court, in a remarkable show of patience, repeatedly tried to explain its rulings to appellant despite the fact that appellant deliberately had chosen an intellectual integument that was impervious to all reason. Furthermore, *1088 he refused to restrain his verbal outbursts, explicitly advising the court, “Gag me, then.” He persisted, even following the court’s repeated warnings, until ultimately it accorded him his wishes and briefly restrained him.[5]
We perceive no other reasonable alternative left open to the court in view of appellant’s obdurate contempt. As he recognizes in his opening brief, the court could not exclude him when he was exercising his constitutional right to self-representation (People v. Carroll (1983) 140 Cal.App.3d 135, 144 [189 Cal.Rptr. 327]), and it certainly was not required to submit to his extortionate misconduct by granting his demand for “co-counsel” or some particular counsel who would defer to his directions.
The record does not reveal exactly how long appellant was restrained. It appears to have continued only during the very brief period required to select alternate jurors after it became necessary to excuse one of the twelve tentatively seated jurors when he expressed his inability to ignore appellant’s outbursts. It is clear, however, that appellant was free to speak by the time the actual trial began.
The subsidiary contention that the court failed to enlighten the jurors on the attitude they should adopt with regard to appellant’s having been restrained also fails. Earlier when, as indicated, one juror had stated he could not overlook appellant’s “outbursts,” the court had attempted to convince *1089 him to try, stating: “Certainly you are not going to let that outburst determine whether or not this man is guilty or not; Are you? . . . Certainly you can set aside any displays of temper, and that sort of— [Mr. Ocampo, the subject juror]: I don’t think so, Your Honor. The Court: Anybody else feel that way? (Negative responses recorded.) The Court: Okay. Mr. Ocampo, we’ll excuse you at this point, then.”
Moreover, when another juror was being selected to replace Mr. Ocampo, the following questions were asked and responses made:
“Q. Do you feel that anything you’ve heard in this case so far will affect your ability to give both sides a fair and impartial judgment?
“A. No, sir.
“Q. Were you present during any outbursts that occurred this morning?
“A. Yes, sir.
“Q. You’ll notice that the court has to have Mr. Trujillo gagged and shackled in order to have him here.
“A. Yes.
“Q. It’s necessary that he be here, because he is appearing in propria persona, [¶] Now, that has nothing whatsoever to do with whether or not he is guilty or not guilty of the charges. [¶] Do you understand that?
“A. Yes, sir.
“Q. And it’s an unfortunate circumstance, but it’s something over which I have no control. I must have him here. And the only way I can get him here with any organization is to do what I’ve done.
“A. Yes, sir.
“Q. Now, can you think of any reason whatsoever why you could not listen to this case and give a completely and impartial judgment on the facts of the case itself?
“A. No, sir.
“Q. All right. [¶] Will you promise to follow the law as I state it to you?
*1090 “A. Yes, sir.” (Italics added.)
Appellant’s contention that the remainder of the jurors might have thought such admonitions applied only to Mr. Ocampo and his replacement is quite unpersuasive.
Finally we note that after all appellant’s efforts to have his will with the court had failed, he apologized to the jury for any problems he had created and proceeded to try the action in as fine a fashion as was possible under the circumstances. That is, when an accused is charged with having inflicted injuries, whose existence and severity are indisputable, upon the person of another with whom he is well acquainted, in the course of both a private and a public assault, a defense of mistaken identity is not a rational possibility. When, in addition, there exists no suggested basis for a “frame-up,” a verdict of guilty will be essentially inevitable regardless of who conducts the trial. In fact, adoption of the role of “underdog” may well be the only strategem holding out any hope for success.
Appellant’s final contention is equally unmeritorious. Relying upon the recent attempt in People v. Bracamonte (1981) 119 Cal.App.3d 644, 650 et seq. [174 Cal.Rptr. 191] to “overrule” the holdings of every other appellate court in this state,[6] including our own,[7] he urges that when he declined the trial court’s offer to hear his constitutional objections to his prior convictions outside the presence of the jury,[8] it was incumbent upon *1091 the court to recall, unaided, Bracamonte’s then recent, and most novel, holding and, forsaking all others, bow thereto by bifurcating proceedings, sua sponte. We cannot agree.
It is doubtful that a true factual question appropriate for a jury’s resolution has ever arisen with respect to a charged prior term of imprisonment. An accused either is the person who was so imprisoned or he is not. Not only will he and his counsel entertain no doubt on this score, fingerprints, photographs and official documents resolve any rational dispute on the point beyond cavil. Any debate concerning the constitutionality of the underlying convictions or the nature of the offenses involved therein, present legal, not factual, issues as to which a jury’s opinion will be quite irrelevant in any event.
As a consequence, except in those rare instances where a defendant has simply insisted upon exposing his felonious past to a jury, there appears never to have been a need even to consider bifurcated proceedings. Furthermore, trial courts traditionally have allowed an accused to concede the fact of his imprisonment, while reserving the question of the legality thereof for later determination by the court itself in the event of a conviction. Such an opportunity was tendered appellant here. When he adamantly rejected it, it was not inappropriate for the court to accord him the jury trial which, by his own conduct, he had made necessary. Certainly it was not required to order a retrial of this cause simply because appellant for the first time cited Bracamonte while orally arguing his new trial motion.
The judgment is affirmed.
Roth, P. J., and Beach, J., concurred.
Appellant’s petition for a hearing by the Supreme Court was denied June 28, 1984. Bird, C. J., was of the opinion that the petition should be granted.
*1092 Appendix A
[[Image here]]
*1093 [[Image here]]
*1094 [[Image here]]
*1095 [[Image here]]
*1096 Appendix B
Norwalk, California; Tuesday, June 1, 1982; 9:38 A.M.
Department Southeast-N Hon. Victor T. Barrera, Judge
Appearances:
The defendant in propria persona; Dale Davidson, Deputy District Attorney of Los Angeles County representing the People of the State of California. (Allen Brodetsky, ProTem Reporter.)
(The following proceedings were held in open court out of the presence of Dale Davidson, Deputy District Attorney.)
The Court: People versus Lorenzo Trujillo.
He is present before the court, and the DA is not present. Mr. Trujillo, the matter has been set for trial today. Did you inquire into civilian clothing?
The Bailiff: Yes, I did, Your Honor. There is a policy now that a person who comes into the jail has access to jail civilian clothing on a loan basis.
The Court: Okay. Mr. Trujillo, we don’t have a DA right now. I just wanted you to hear what the bailiff had to say. Why don’t we wait until he gets in here, and you can make whatever comments you wish. Okay. He is remanded.
(Recess.)
The Court: People versus Lorenzo Trujillo. He is represented before the court represented by himself. The People are represented. Mr. Trujillo, this matter is set for trial today. The last time you were here you were requesting money for clothes. I have since ascertained that the sheriff’s department has clothes available. And so I will let you discuss the matter with me if you wish, that is, argue your motion.
The Defendant: I object to that. It is all hearsay. I have never heard of or seen anybody that has been loaned clothes or given clothes from the court.
The Court: Your motion is denied. The sheriff is ordered to provide Mr. Trujillo with appropriate civilian clothing for trial. Are you ready for trial otherwise, Mr. Trujillo?
The Defendant: I have a motion here for—
The Court: Okay. Hand it to the bailiff if you will.
The Defendant: I need copies run off.
The Court: What is that motion? Now, you are asking a lawyer be appointed, and I am not going to bother reading this because I think you more than anybody have massaged the system. I think you have a right to a lawyer. I will tell you this, and I won’t hear you again in terms of you wanting to represent yourself. You had the maximum term, and you want to represent yourself, and you want to relinquish that. I will allow you to do that. I will not hear you again demanding to be pro per.
Mr. Geisendorfer is here if you want a lawyer. You have somebody from the public defender’s office. You interview him and determine whether he qualifies.
Mr. Geisendorfer: May I give him a financial statement and ask that the bailiff supply him with something to write with to fill out the financial statement.
The Court: The clerk is ordered to xerox this motion twice and provide the district attorney and defendant with a copy. Mr. Trujillo, we will bring you out shortly when you have completed that financial statement, and let us see whether or not the public defender can represent you.
Mr. Davidson: Thank you, Your Honor.
(Recess.)
The Court: People versus Lorenzo Trujillo.
Let the record reflect the defendant is present in court. The prosecution is represented. Mr. Trujillo, this morning I granted your motion for an attorney. I understand you qualify for the services of the public defender, and Rita Harris is available. You have requested that I appoint some specific private lawyers. Private lawyers are not appointed unless there is a conflict on the part of the public defender or the public defender is unavailable neither of which has occurred in this case. What do you want to do?
The Defendant: I have been represented by two public defenders since I have been arraigned on this case and neither of which came to the county jail to see me or made any effort to try to represent me in any kind of way. I know I have a right to counsel, and I was trying to ask the court to try to appoint private counsel.
The Court: You can appoint anyone you want. They won’t be paid. That is the difference. You can have any lawyer you can pay for otherwise the county is going to pay for *1097 the public defender until such time there is a conflict or the public defender is unavailable and as I said neither has occurred in this case. You can have Ms. Harris or nobody.
The Defendant: What you are telling me, you are giving me Ms. Harris? You are giving me nobody. If that is the way the court—
The Court: You want to make—
The Defendant: I’ll have nobody then.
The Court: Mr. Trujillo, don’t talk when I’m talking, or I am going to get mad. Just control yourself. Mr. Trujillo, I don’t think you should do anything precipitously. And as I told you before, and I will tell you again it is very foolish to represent yourself; however, you heard my song before. All I want you to do is be definite about what you want. If you don’t want a lawyer, I will go ahead and relieve the public defender. What do you want to do?
The Defendant: I am not going to go with the public defender. I have heard the public defender in there lying to people and telling them all kinds of lies and saying you can’t beat it; it is better to go to prison than to take probation. You will get out faster, you know. I am not guilty of what I am being accused. I was illegally bound as it was shown on the record through the motion that I have filed and on my 995. I am accused of something that I didn’t do. I didn’t need somebody to tell me the best thing to do was to plead guilty and to take what ever they are offering.
The Court: Okay.
You are withdrawing your motion then? Is that what you are doing?
The Defendant: I will just have to file a 170.6 and try to get in front of another court or something. I am not getting nothing in this court here.
The Court: If that is what you want to do is file a 170.6. there is one right in front of you some place.
Mr. Davidson: I don’t have any of the forms up here, Your Honor, perhaps, the public defender does.
The Court: There is one in one of those boxes.
Mr. Trujillo, fill that out and I will send you to another court. Sit down right there and fill it out. Are you through?
The Defendant: Yes.
The Court: The affidavit in this matter has been signed and is ordered filed. Well, first of all, concerning your motion, do you want to withdraw it and take your chances with the next judge?
Mr. Davidson: If the court is going to honor the 170.6, this is not timely, I believe.
The Court: The matter has been set for trial today. The lawyers are going to need some time. As far as I am concerned, the motion is still outstanding.
Take this down to—I am not sure which judge it will be. You are remanded. This matter will be sent to Department A.
The Defendant: I’d like a copy.
The Court: Yes, a copy of that last motion.
Mr. Davidson: Thank you, Your Honor.
The Court: You are remanded. (Proceedings Concluded.)

The petition to proceed in propria persona executed by appellant is attached hereto as Appendix A.

On our own motion, we augmented the record on appeal to include a transcript of this proceeding and attach it hereto as Exhibit B. It further demonstrates that appellant’s in pro. per. status was clearly a matter of choice.

These motions, as previously indicated, were predicated solely upon appellant’s having represented himself at his preliminary hearing.

Appellant at one point advised the trial court that the judge who, as noted, had handled this case for six months prior to appellant’s having moved to disqualify him on the morning of trial had granted appellant’s request to appoint the public defender to represent appellant on April 1, 1982, but appellant had declined to accept the appointment because he had a “conflict of interest” with the particular deputy assigned to him. (See also Appendix B.)
Furthermore, the trial court itself had offered to appoint the deputy public defender appellant had originally rejected but noted that “she can’t come down here and try this case today. You fired her some time ago.” Appellant manifested no interest in such an offer.

Even earlier before the potential jurors had been brought into the courtroom, the following prophetic exchange had occurred:
“The Defendant: Well, then, I bring to the court’s attention that if the court insists on me going pro per, and with intentions of railroading me in order to get a conviction for the State of California, that the court go ahead and proceed without the defendant.
“The Court: No, we will not do that.
“The Defendant: And hold the trial. The defendant will sit out of the court. He will not take any participation in the trial. And the court can go ahead and—and—and— [¶] The court can go ahead and—and send the verdict to the defendant in the holding cell.
“The Court: Mr. Trujillo—
“The Defendant: Because the defendant is not going to. Doesn’t know anything about procedures or juries or anything, and is not going to be—to be forced to come out here and get himself convicted for the pleasing of the court.
“The Court: If you wish to absent yourself from the trial, it would be your prerogative, if you were represented by an attorney.
“The Defendant: Well, I am not going to represent myself.
“The Court: If you are not going to be represented by an attorney—
“The Defendant: This is to' satisfy the court.
“The Court: Just a moment. While I’m speaking, let me speak, [¶] If you are going to proceed in propria persona, you are going to be in this courtroom during the trial.
“The Defendant: I am not proceeding in propria persona.
“The Court: Well, you are going to have to, sir. That’s all.
“The Defendant: Well, you are going to just have to gag me and drag me into the courtroom and chain me up in front of the jury, I guess.
“The Court: If I have to, sir, I have to.
“The Defendant: Well, that is exactly what I want you to do. ” (Italics added.)

“The constitutionality of the statutory scheme for pleading and proving prior convictions has been upheld repeatedly, and the very argument now advanced by appellant has been rejected numerous times by the Courts of Appeal, with apparent assent by the California Supreme Court. (People v. Guillen (1974) 37 Cal.App.3d 976, 979 . . .; People v. Mason (1969) 269 Cal.App.2d 311, 313 . . .; People v. Hickok (1964) 230 Cal.App.2d 57, 59-60 . . . (petn. for hg. den. by Supreme Ct.), cert. den. 381 U.S. 954 . . .; People v. Hoerler (1962) 208 Cal.App.2d 402, 407-408 . . . (petn. for hg. den. by Supreme Ct.); People v. McDaniel (1958) 157 Cal.App.2d 492 . . . app. dism. sub nom. McDaniel v. California (1959) 358 U.S. 282 . . . (for want of substantial federal question).)” (People v. Owens (1980) 112 Cal.App.3d 441, 446 [169 Cal.Rptr. 359].)

People v. Cruz (1970) 6 Cal.App.3d 384, 394 [85 Cal.Rptr. 918], cert. den. 400 U.S. 966 [27 L.Ed.2d 386, 91 S.Ct. 377],

“The Court: All right, [¶] Do you, then, at this time wish to withdraw the denial of the two felony convictions and admit the fact that you were so convicted? The Defendant: I wish to withdraw the denial of the convictions, but to plead not guilty under constitutional issues. The Court: I beg your pardon? The Defendant: Under constitutional issues that the convictions were illegal. And I’d like to have all the trial heard on each of the convictions, because on constitutional issues my rights were violated. The Court: What constitutional issues are you complaining about? The Defendant: Illegal search and seizure. The Miranda rights weren’t read to me. The Court: Well, you can’t—you can’t attack the convictions at this point on those grounds. Those would have been grounds to appeal the conviction originally. The Defendant: Well, I wish to fight them on the constitutional issues. The Court: Well, you realize, then, that we have no recourse, then, but to refer those matters to the jury and they hear them. If you wish to make a subsequent attack upon *1091 them at the time fixed at a later point, the court will permit you to do so. But right now, you either have to admit them or deny them, one way or the other. The Defendant: I am doing neither. The Court: You are doing neither? The Defendant: Neither. The Court: Well, then, the matters will go in front of the jury, then, Mr. Trujillo. You do not have the right to just be— The Defendant: I will take the Fifth then. The Court: All right. Fine, [¶] It’s all right by me. If you want to let it go in front of the jury, fine.” (Italics added.)